1  BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER, LLP
   Alan R. Plutzik (State Bar No. 77785)
2  Michael S. Strimling (State Bar No. 96135)
   2125 Oak Grove Road, Suite 120
3  Walnut Creek, CA 94598
   Telephone: (925) 945-0200
4  Facsimile: (925) 945-8792
   Email: aplutzik@bramsonplutzik.com
5  Email: mstrimling@bramsonplutzik.com

6  LEVI KORSINSKY LLP
   Joseph Levi
7  Eric M. Andersen
   30 Broad Street, 15th Floor
8  New York, New York 10004
   Telephone: (646) 453-8908
9  Facsimile: (212) 363-7171
   Email: jlevi@zlk.com
10 Email: eandersen@zlk.com

11

   Attorneys for Plaintiff
12

13              UNITED STATES DISTRICT COURT

14             NORTHERN DISTRICT OF CALIFORNIA

15                  San Francisco Division

16 LUIS RODRIGUEZ, individually and on behalf )
   of all others similarly situated,           ) No. C 11- 06629 JSC
17                                              )
                                                )
18              Plaintiff,                       )
                                                )
19 v.                                           )     **AMENDED CLASS ACTION**
                                                )    **COMPLAINT FOR VIOLATION OF**
20 BRIAN M. NESMITH, DAVID W. HANNA,            )     **THE FEDERAL SECURITIES LAWS,**
   JAMES A. BARTH, JAMES R. TOLONEN,            )  **AND FOR VIOLATION OF STATE LAW**
21 KEITH GEESLIN, CAROL G. MILLS,               )     **BREACHES OF FIDUCIARY DUTY**
   GREGORY S. CLARK, BLUE COAT                  )
22 SYSTEMS, INC., THOMA BRAVO, LLC,             )
   PROJECT BARBOUR HOLDINGS                     )
23 CORPORATION, and PROJECT BARBOUR             )
   MERGER CORP.,                                )
24                                              )
                                                )
25              Defendants                       )

26

27

28

Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

1. Plaintiff brings this class action on behalf of the public stockholders of Blue Coat Systems, Inc. ("Blue Coat" or the "Company") against Blue Coat's Board of Directors (the "Board" or the "Individual Defendants") seeking equitable relief for their violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9"), and for their breaches of fiduciary duties arising out of their attempt to sell the Company to an investor group led by private equity investment firm Thoma Bravo, LLC ("Thoma Bravo").

2. On December 9, 2011, Blue Coat and Thoma Bravo announced a definitive agreement under which Thoma Bravo, through its affiliates Project Barbour Holdings Corporation ("Project Barbour") and Project Barbour Merger Corp. ("Merger Sub"), will acquire all of the outstanding shares of Blue Coat for $25.81 per share in cash (the "Proposed Transaction"). The Proposed Transaction is valued at $1.3 billion.

3. The Proposed Transaction, however, is unfair to Blue Coat shareholders, does not offer them adequate consideration, was the result of an unfair sales process, and is going to be effected through the dissemination of a materially false and misleading proxy statement, as demonstrated by the Preliminary Proxy Statement filed by Blue Coat on December 23, 2011 (the "Proxy").

4. The Board has breached their fiduciary duties by agreeing to the Proposed Transaction for grossly inadequate consideration. As described in more detail below, given Blue Coat's recent strong performance as well its future growth prospects, the consideration shareholders are to receive is inadequate and undervalues the Company.

5. The Individual Defendants have exacerbated their breaches of fiduciary duty by agreeing to lock up the Proposed Transaction with deal protection devices that preclude other bidders from making a successful competing offer for the Company. Specifically, pursuant to the merger agreement dated December 8, 2011 (the "Merger Agreement"), defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers

65267

1

1     or even in continuing discussions and negotiations with potential acquirers; (ii) a provision that

2     provides Thoma Bravo with three business days to match any competing proposal in the event one

3     is made; and (iii) a provision that requires the Company to pay Thoma Bravo a termination fee of

4     $39 million in order to enter into a transaction with a superior bidder. These provisions

5     substantially and improperly limit the Board's ability to act with respect to investigating and

6     pursuing superior proposals and alternatives including a sale of all or part of Blue Coat.

7          6. In connection with the Proposed Transaction, on December 23, 2011, the Company

8     filed the Proxy with the SEC. The Proxy fails to provide the Company's shareholders with

9     material information and provides them with materially misleading information thereby rendering

10    the shareholders unable to make an informed decision regarding whether to vote in favor of the

11    Proposed Transaction. Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-

12    9 promulgated thereunder, by omitting material facts necessary to render the Proxy non-

13    misleading. Defendants have also breached their fiduciary duty of candor by failing to disclose

14    material information to the Blue Coat shareholders necessary for them to determine whether to vote

15    in favor of the Proposed Transaction. The misrepresentations and omissions in the Proxy are

16    material to Plaintiff and the class he seeks to represent. Without this information, Plaintiff and the

17    other Blue Coat shareholders will be deprived of their entitlement to make an informed decision on

18    whether to vote in favor of the Proposed Transaction should these misrepresentations and

19    omissions not be cured prior to the shareholder vote on the Proposed Transaction.

20        7. The Individual Defendants have breached their fiduciary duties of loyalty, due care,

21    independence, good faith and fair dealing, and Blue Coat, Thoma Bravo, Project Barbour, and

22    Merger Sub have aided and abetted such breaches by Blue Coat's officers and directors. Plaintiff

23    seeks to enjoin the Proposed Transaction unless and/or until defendants cure their breaches of

24    fiduciary duty.

25                                **JURISDICTION AND VENUE**

26        8. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question

27    jurisdiction), as this Complaint alleges violations of Section 14(a) of the Exchange Act and Rule

28    14a-9. This court has jurisdiction over the state law claims pursuant to 28 U.S.C. §1367. In

65267

addition, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and Defendants are citizens of different states and countries and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of Florida, and no defendant is a citizen of that country.

9.      This action is not a collusive one to confer jurisdiction on a court of the United States which it would otherwise not have.

10.      Venue is proper in this district because nominal defendant Blue Coat maintains its principal executive offices in the district and the defendants have conducted business and engaged in numerous activities which have had an effect on this district.

11.      Venue is proper in this district because a substantial portion of the transactions and wrongs alleged herein occurred in this district.

**PARTIES**

12.      Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Blue Coat. Plaintiff is a citizen of the state of Florida.

13.      Blue Coat is a corporation organized and existing under the laws of Delaware.  Blue Coat has its principle executive offices located at 420 North Mary Avenue, Sunnyvale, California 94085.  Blue Coat is a leading provider of Web security and WAN optimization solutions.

14.      Defendant David W. Hanna ("Hanna") is and has been a director of Blue Coat since October 1996, and is and has been Chairman of the Board of Directors since February 2001.  He also serves as Chairman of the Board of Director's Nominating/Corporate Governance Committee. He is the Chairman of the Board of Directors, CEO, and/or President of The Hanna Group, Hanna Capital Management, and Hanna Ventures LLC, a venture capital firm that lists Blue Coat as one of its portfolio companies.  Hanna is a resident of California.

15.      Defendant James A. Barth ("Barth") is and has been a director of Blue Coat since January 2005, and he is also Chairman of the Board of Directors' Audit Committee and a member of the Board of Directors' Nominating/Governance Committee.  Barth is a resident of California.

16.      Defendant James R. Tolonen ("Tolonen") has been a director of the Company since 2008, and he is also Chairman of the Board of Directors' Compensation Committee and a member

of the Audit Committee. Tolonen is a resident of California.

17.    Defendant Keith Geeslin ("Geeslin") is and has been a director of Blue Coat since June 2006, and he is also a member of the Board of Directors' Compensation Committee and Audit Committee.  He is employed as a partner at Francisco Partners Management LLC ("Francisco Partners"), a private equity firm that lists Blue Coat as one of its portfolio companies.  Geeslin is a resident of California.

18.    Defendant Carol G. Mills ("Mills") is and has been a director of Blue Coat since January 2009.  Defendant Mills served as Interim CEO of the Company between August 16, 2011 and September 15, 2011.  Mills is a resident of California.

19.    Defendant Gregory S. Clark ("Clark") has served as Blue Coat's President, Chief Executive Officer, and a director since September 12, 2011. Clark is a resident of California.

20.    Defendant Brian A. NeSmith ("NeSmith") served as a member of the Company's Board of Directors from March 1999 until his resignation on December 16, 2011.  NeSmith was a director of the Company when the Merger Agreement was executed and, along with the other Board members, voted to approve the Merger Agreement and the Proposed Transaction. NeSmith previously served as the Company's President and Chief Executive Officer ("CEO") from March 1999 through August 2010, and also served as the Company's Chief Product Officer from September 2010 through May 2011.  NeSmith is a resident of California.

21.    Defendants referenced in ¶¶ 14 through 20 are collectively referred to as Individual Defendants and/or the Board.

22.    Defendant Thoma Bravo is a private equity firm with a focus on software and technology businesses.  Thoma Bravo has offices in Chicago, Illinois and San Francisco, California.

23.    Defendant Project Barbour Holdings Corporation is a Delaware corporation and is a controlled affiliate of Thoma Bravo and that was created for the purposes of effectuating the Proposed Transaction.

24.    Defendant Project Barbour Merger Corp. is a Delaware corporation wholly owned by Project Barbour and is a controlled affiliate of Thomas Bravo that was created for the purposes

1    of effectuating the Proposed Transaction.

2    **INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES**

3         25.    By reason of Individual Defendants' positions with the Company as officers and/or

4    directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of

5    Blue Coat and owe them, as well as the Company, a duty of care, loyalty, good faith, candor, and

6    independence.

7         26.    Under Delaware law, where the directors of a publicly traded corporation undertake

8    a transaction that will result in either a change in corporate control or a break up of the

9    corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest

10   value reasonably available for the corporation's shareholders, and if such transaction will result in

11   a change of corporate control, the shareholders are entitled to receive a significant premium. To

12   diligently comply with their fiduciary duties, the Individual Defendants may not take any action

13   that:

14        (a)    adversely affects the value provided to the corporation's shareholders;

15        (b)    favors themselves or will discourage or inhibit alternative offers to purchase

16   control of the corporation or its assets;

17        (c)    adversely affects their duty to search and secure the best value reasonably

18   available under the circumstances for the corporation's shareholders; and/or

19        (d)    will provide the Individual Defendants with preferential treatment at the

20   expense of, or separate from, the public shareholders.

21        27.    In accordance with their duties of loyalty and good faith, the Individual Defendants

22   are obligated to refrain from:

23        (a)    participating in any transaction where the Individual Defendants' loyalties

24   are divided;

25        (b)    participating in any transaction where the Individual Defendants receive, or

26   are entitled to receive, a personal financial benefit not equally shared by the public shareholders of

27   the corporation; and/or

28

1           (c)      unjustly enriching themselves at the expense or to the detriment of the public

2  shareholders.

3        28.     Plaintiff alleges herein that the Individual Defendants, separately and together, in

4  connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary

5  duties, including their duties of care, loyalty, good faith, candor, and independence owed to

6  plaintiff and other public shareholders of Blue Coat.

7                      **CLASS ACTION ALLEGATIONS**

8        29.     Plaintiff brings this action on its own behalf and as a class action on behalf of all

9  owners of Blue Coat common stock and their successors in interest, except Defendants and their

10  affiliates (the "Class").

11        30.     This action is properly maintainable as a class action for the following reasons:

12           (a)      the Class is so numerous that joinder of all members is impracticable.  As of

13  December 13, 2011, Blue Coat has approximately 42.80 million shares outstanding.

14           (b)      questions of law and fact are common to the Class, including, inter alia, the

15  following:

16                 (i)      Have the Individual Defendants misrepresented and omitted material

17                        facts in violation of Section 14(a) of the Exchange Act;

18                 (ii)     Have the Individual Defendants breached their fiduciary duties of

19                        undivided loyalty, independence, or due care with respect to plaintiff

20                        and the other members of the Class in connection with the Proposed

21                        Transaction;

22                (iii)    Have the Individual Defendants breached their fiduciary duty to

23                        secure and obtain the best price reasonable under the circumstances

24                        for the benefit of plaintiff and the other members of the Class in

25                        connection with the Proposed Transaction;

26                (iv)    Have the Individual Defendants breached any of their other fiduciary

27                        duties to plaintiff and the other members of the Class in connection

28

65267

with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(v)     Have the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(vi)    Have the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

(vii)   Whether plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated.

(viii)  Have Blue Coat, Thoma Bravo, Project Barbour, and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(ix)    Is the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

65267

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy

FURTHER SUBSTANTIVE ALLEGATIONS

31.     Blue Coat Systems is a leading provider of Web security and WAN optimization solutions.  Blue Coat offers solutions that provide the visibility, acceleration and security required to optimize and secure the flow of information to any user, on any network, anywhere. Blue Coat also offers service provider solutions for managed security and WAN optimization, as well as carrier-grade caching solutions to save on bandwidth and enhance the end-user Web experience.

32.     Earlier in 2011, Blue Coat common stock traded well above the Proposed Transaction price of $25.81 per share.  As can be seen in the chart below, Blue Coat common stock traded as high as $29.25 per share in May 2011 and as high as $32.33 per share in January 2011.



33.     The Company's stock price took a hit during the first two full quarters in 2011 as the Company reported lower than expected results. On May 26, 2011, Blue Coat announced its financial results for the quarter ending April 30, 2011. Total net revenue for the quarter was $120.7

65267

million compared with net revenue of $122.9 million in the prior quarter. The Company reported net income for the quarter of $9.0 million compared with net income of $12.1 million, for the prior quarter. In the press release announcing the financial results, the Company's then-CEO Michael J. Borman ("Borman") commented on the Company's poor performance, stating: "I am not satisfied with our revenue performance, as we did not deliver the top-line results that I believe we are capable of. While Blue Coat is well positioned in two great markets and possesses a strong and competitive product portfolio, the company is in transition as we work to improve our revenue performance."

34. On August 16, 2011, Blue Coat announced its financial results for the quarter ending July 31, 2011. The Company reported total net revenue for the quarter of $109.5 million compared with net revenue of $120.7 million in the prior and $122.5 million in the same quarter of the prior year. The Company reported net income of $2.7 million for the quarter, compared with net income of $9.0 million in the prior quarter, and $13.9 million, for the same quarter in the prior year. "Our first quarter results were disappointing as they came in below our expectations," said defendant Hanna, the Company's Chairman of the Board. "We are taking the necessary actions to reinforce our leadership position in the Web security market, while capitalizing on opportunities in the WAN optimization market based on our strong competitive advantages." As a result of two poor quarters, the Company's stock price closed at $13.31 per share on August 17, 2011.

35. In conjunction with the announcement of its financial results for the quarter ending July 31, 2011, Blue Coat also announced the appointment of defendant Gregory S. Clark as President and CEO of Blue Coat, effective September 15, 2011. Clark replaced Borman, who departed as Blue Coat's President and CEO. "Greg is a proven leader with a track record of driving growth and shareholder value," said David W. Hanna, Chairman of the Board of Blue Coat. "Greg has the right combination of technical depth, market insight and managerial skills to enable Blue Coat to capitalize on its strong franchise in Web security and WAN optimization."

36. In the past few months, under Clark's leadership, Blue Coat has already seen significant improvement, and Clark has quickly positioned Blue Coat for tremendous growth. On November 17, 2011, the Company announced its financial results for the quarter ending October

9

31, 2011. The Company reported (a) net revenue of $114.1 million compared with net revenue of $109.5 million in the prior quarter; and (b) net income of $4.6 million compared with net income of $2.7 million in the prior quarter. "In the second quarter, we delivered better revenue results than we anticipated, which drove improved bottom line performance," said defendant Clark, in the press release announcing the financial results. "During the quarter we also made progress on refining our strategy and improving execution in specific areas of the company. Importantly, we implemented initiatives to extend our leadership in Web security and to better leverage our differentiated WAN optimization capabilities."

37.    In a November 17, 2011 conference call, Clark commented on a number of achievements accomplished by the Company under his leadership that has positioned the Company for future growth. As stated by Clark in the conference call:

> Turning to some second quarter highlights. In Q2, Web Pulse, our cloud-based classification and anti-malware service, ***reached a significant milestone*** by serving 1 billion Web content inquiries in a single day. This volume of requests is indicative of the increasing use of our technology in the market and the significant impact our WebPulse service has on malware prevention. WebPulse also provides deep intelligence about web patterns, user behavior and malware ecosystems. As a result, we can effectively identify and block the malware that plagues all corporate users. For those of you familiar with our products, WebPulse is a service behind our WebFilter product in the appliance.
>
> ***We also had some significant customer wins in the second quarter***. I have selected some examples that highlight the opportunities before us. In Q2, we closed a large deal with a leading global financial services firm that needed a more robust security solution for its consumer Internet banking sites. The customer purchased our security appliances replacement between the retail banking users and the service for its Internet site. This win is a great example of an Internet-to-corporate appliance deployment, or what is commonly called a reverse proxy, which enables secure access of internal corporate resources via the Internet. A reverse proxy deployment is an example of an underpenetrated use case of our appliances and represents an additional opportunity for us to sell our products.
>
> In the quarter, ***we also saw good traction in our Blue Coat cloud security service***. In particular, there were 2 deals that stood out. First, a leading national electronics retail purchased an initial 35,000 seats of our cloud security service. This deployment provides Web protection for its corporate headquarters as well as for its 6,500 retail locations. We are seeing strong interest for our cloud security service

10

65267

from organizations with large numbers of remote locations such as in retail and education verticals. Second, an American-based manufacturing company purchased an initial 13,000 seats of our cloud security service along with their MACH5 appliances. MACH5 appliances provide remote location acceleration for its critical corporate applications, and by connecting the MACH5 appliances to our cloud security service, the customer is also able to secure Web access in its remote locations. This combination of our optimization and security solutions differentiate us from our competitors.

These customer wins highlight Blue Coat's product leadership in its markets, and while there is more work ahead, we're capitalizing on the company's strengths and addressing its key challenges. ***Progress is well underway and we're beginning to see some results for improved execution.*** Now I'd like to turn to my view of the company.

***Many of the fundamentals for Blue Coat's future success are in place today. We are well-positioned in our 2 markets***. Blue Coat has an exceptionally strong brand and product portfolio in Web security and WAN optimization products that lead in addressing the unique acceleration requirements of the next-generation applications in rich media. I've always been impressed with Blue Coat's security appliances and see great potential in our hybrid strategy, which combines on-premise appliances with our cloud security service. This unique approach gives enterprise appliance customers the capability to extend the same level of protection to mobile workers and smaller branch officers where an appliance is not cost justified. And with our cloud security service, we now have the right vehicle to further penetrate in the global 10,000.

Blue Coat also has a highly differentiated WAN optimization product with performance capabilities that are aligned where I believe the market is headed. In particular, I believe we should win our fair share of deals for any quality of service, visibility, document caching, video, web or SaaS acceleration as a main driver of closing business. Blue Coat has some strong technical advantages in WAN Optimization, mainly the company's heritage in asymmetric optimization and object caching as well as the power of application and web content classification. This is impressive and hardened technology that allows us to uniquely prioritize and accelerate voice over IP, video, Web and SaaS application traffic. In addition, our policy management provides industry-leading visibility control over social networking, Web content and other issues facing our customers. These capabilities are well ahead of those of many of our competitors. In the longer term, these types of acceleration opportunities and application trends should drive the market's future direction and justify our continued focus in this investment. [Emphasis Added]

***The Company Enters into the Unfair Proposed Transaction***

38.     Despite the Company's recent strong performance and positioning for growth, in a press release dated December 9, 2011, the Company announced that it had entered into a merger agreement to be acquired by an investor group led by Thoma Bravo for $25.81 per share in cash. The investor group, led by Thoma Bravo, includes the Ontario Teachers' Pension Plan through its private investor department, Teachers' Private Capital.

39.     The Proposed Transaction consideration is inadequate and undervalues the Company.

40.     Thoma Bravo is seeking to acquire at the most opportune time, at a time when the Company's stock price is still trading at depressed prices and at a huge discount to its intrinsic value as a result of the two poor quarters immediately preceding Clark's appointment.  With the Company beginning to improve and positioned for future growth, Blue Coat shareholders are being cashed out at the most inopportune time and at an unfair price.

41.     Meanwhile, Thoma Bravo will benefit tremendously by picking up Blue Coat on the cheap. "Blue Coat has strong, differentiated products for protecting enterprises from the ever increasing levels of Web-based security threats and for accelerating and optimizing applications and rich media content, such as video, over their networks," said defendant Clark. "Our partnership with Thoma Bravo will assist Blue Coat in more aggressively realizing the opportunities in its two markets, by providing a platform that enables greater focus on the business that supports the future growth of the company."

42.     "Blue Coat is an award-winning, global leader in next generation Web security and WAN optimization, and we welcome the opportunity to work with its existing management team," said Orlando Bravo, managing partner at Thoma Bravo. "As a private company, Blue Coat will be better positioned to innovate at an accelerated rate and achieve a higher level of growth."

43.     "Blue Coat marks the continuation of Thoma Bravo's investment efforts in the security technology industry, and is the firm's fifth security technology platform investment," said Seth Boro, partner at Thoma Bravo. "We are excited to partner with Blue Coat on strengthening its industry leadership position through product innovation, enhancing its world-class customer support and identifying organic and strategic growth opportunities."

65267

44.     The *Present Value of Future Share Price Analysis* conducted by Goldman, Sachs & Co. ("Goldman Sachs"), the Company's financial advisor, yielded a value for the Company as high as $30.78 per share.

45.     Further, according to Yahoo Finance, at least one analyst set a price target for Blue Coat common stock as high as $28.00 per share.

46.     Accordingly, the Proposed Transaction consideration is inadequate.

***The Preclusive Deal Protection Devices***

47.     In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

48.     §6.03(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to  procure a price in excess of the amount offered by Thoma Bravo.

49.     Pursuant to §6.03 of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify Thoma Bravo of the bidder's identity and the terms of the bidder's offer.  Thereafter, should the Board determine that the unsolicited offer is superior, before the Company can terminate the Merger Agreement with Thoma Bravo in order to enter into the competing proposal, it must grant Thoma Bravo three business days in which the Company must negotiate in good faith with Thoma Bravo (if Thoma Bravo so desires) and allow Thoma Bravo to amend the terms of the Merger Agreement to make a counter-offer so that the competing bid ceases to constitute a superior proposal.  In other words, the Merger Agreement gives Thoma Bravo access to any rival bidder's information and allows Thoma Bravo a free right to top any superior offer simply by matching it.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Thoma Bravo and piggy-back upon the due diligence of the foreclosed second bidder.

50.     The Merger Agreement also provides that a termination fee of $39 million must be paid to Thoma Bravo by Blue Coat if the Company decides to pursue the competing offer, thereby

essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

51.     Ultimately, these preclusive deal protection provisions illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company.  The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

***Blue Coat's Executives Officers and Directors Stand to Receive Unique Material Financial Benefits in the Proposed Transaction Not Available to Blue Coat's Public Shareholders***

52.     The Company's executive officers and directors have material conflicts of interest and are acting to better their own personal interests through the Proposed Transaction at the expense of Blue Coat's public shareholders.

53.     Each of  Blue Coat's executive officers have change in control severance agreements with Blue Coat which provides that if an executive's employment is terminated without cause or if the executive terminates his or her employment for good reason within two months before or 18 months after a change in control, which, the executive will receive severance and other benefits. The following chart shows the amount of severance and other benefits each executive officer would receive pursuant to their severance agreements:

| Name | Cash ($) | Perquisites/Benefits ($) |
|---|---|---|
| Gregory S. Clark | 1,250,000 | 34,826 |
| Gordon C. Brooks | 466,250 | 23,217 |
| Steve A. Daheb | 435,000 | 23,217 |
| Marc Andrews | 525,000 | — |
| Betsy E. Bayha | 425,000 | 15,296 |

54.     Although each officer is entitled to substantial sums, the amount Clark is entitled to is especially egregious considering Clark, at the time the Merger Agreement was announced, had been serving as an executive officer of the Company for a mere three months.

14

55.     In addition, the Company's executive officers and directors hold unvested stock options, restricted stock units and restricted shares of the Company that, pursuant to Merger Agreement, will automatically vest and no longer be subject to restrictions. The following chart shows the value of the unvested stock options, restricted stock units, and restricted shares held by the Company's officers and director that they will now be able to cash out in connection with the Proposed Transaction:

| Name | Value of Accelerated Vesting of Unvested Stock Options ($)[1] | Value of Accelerated Vesting of Unvested RSUs and Restricted Shares ($)[1] |
|---|---|---|
| Gregory S. Clark | 2,925,000 | 2,581,000 |
| Gordon C. Brooks | 404,334 | 1,368,240 |
| Steve A. Daheb | 60,450 | 1,357,606 |
| Marc Andrews | 487,500 | 655,574 |
| Betsy E. Bayha | 172,518 | 702,135 |
| James A. Barth | 49,600 | 77,430 |
| Keith Geeslin | 39,680 | 85,173 |
| David W. Hanna | 39,680 | 77,430 |
| Carol G. Mills | 139,790 | 77,430 |
| James R. Tolonen | 27,773 | 85,173 |

Again, Clark specifically is receiving a huge financial windfall considering his short tenure as the Company's CEO.

56.     Moreover, the Merger Agreement contains provisions relating to the indemnification of and insurance for the Company's directors and officers.  As stated in the Proxy, the Merger Agreement "provides that for a period of six years after the effective time of the Merger and to the fullest extent permitted by law or provided under Blue Coat's certificate of incorporation or bylaws or in an agreement between Blue Coat and its current or former officers and directors, the surviving corporation will indemnify the current or former officers and directors of Blue Coat with respect to acts or omissions occurring at or prior to the effective time."  This provision is particularly important as each of the Company's directors are currently defendants in shareholder derivative litigation actions that are currently pending in the United States District Court for the Northern District of California.  The shareholder derivative litigation seeks to recover damages

15

65267

from the defendants in connection with their breaches of fiduciary duties and other violations of law resulting from alleged false and misleading statements that the defendants allowed the Company to disseminate. Accordingly, the directors were incentivized to approve the Proposed Transaction to shield them from potential monetary liability as a result of the derivative litigation.

57.     Based on the above, the Proposed Transaction is unfair to Blue Coat's public shareholders, and represents an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members.

***The Proxy is False and Misleading***

58.     To make matters worse, defendants are withholding material information about the Proposed Transaction from Blue Coat's public shareholders.  The Proxy, which recommends that Blue Coat shareholders vote in favor of the Proposed Transaction, contains numerous material omissions and misstatements, in contravention of the Board's duty of candor and full disclosure and in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

**Disclosures Concerning the Events Leading Up to the Announcement of the Proposed Transaction**

59.     The Proxy fails to disclose material information pertaining to the events leading up to the announcement of the Proposed Transaction.  In particular, the Proxy:

(a)     States that in October 2010, Elliott Associates, L.P.  ("Elliot") contacted Blue Coat management "to urge a sale" and that in December 2010 Elliott again urged the Board to put Blue Coat up for sale, but fails to disclose what the Board responded to Elliott.

(b)     Fails to disclose the "the risks that Elliott's increasing holdings posed to Blue Coat" that was discussed by the Board in early 2011.

(c)     Fails to disclose the reasons the "Board considered Elliott's Schedule 13D filing as indicative of Elliott's potential interest in attempting to force a change in control of Blue Coat" as discussed by the Board on February 15, 2011.

(d)     Fails to disclose "Elliott's articulated concerns with respect to Blue Coat," and the "appropriate steps that might be taken by Blue Coat to both address those concerns and to

16

preserve and enhance the value of Blue Coat and its assets" that was discussed by the Board on March 24, 2011.

(e) Fails to disclose in the *The Recommendation of Blue Coat's Board and Blue Coat's Reasons for the Merger* section of the Proxy to what extent did Elliott's activities in the months preceding the announcement of the Proposed Transaction play a role in the Board's decision to enter into the Proposed Transaction.

(f) Fails to disclose the criteria used to select the nine strategic parties that were contacted by Goldman Sachs in June and July 2011.

(g) Fails to disclose how many strategic buyers remained in the process throughout August, September, and November, and the nature of the meetings held with such parties, as indicated on page 21 of the Proxy.

(h) Fails to disclose how many private equity firms were on the list of "private equity firms considered to be plausible acquirers of Blue Coat" as described on page 21 of the Proxy.

(i) States that "from August until the execution of the Merger Agreement, Goldman Sachs made contact with 20 private equity firms, some of whom initially contacted Goldman Sachs on an unsolicited basis," but fails to disclose how many of the 20 firms were not among the group that contacted Goldman Sachs on their own.

(j) Fails to disclose the criteria used by the Board to select Barth and Tolonen to serve on the transaction advisory committee.

(k) Fails to disclose the "common themes and concerns raised by the potential bidders" that was discussed by Goldman Sachs on September 30, 2011.

(l) Fails to disclose the values of the indications of interest submitted by each of Thoma Bravo, PE1, PE2, and PE3 on October 12, 2011.

(m) Fails to disclose the reasons Blue Coat management recontacted S1 in November 2011.

65267

(n)     Fails to disclose the "stock market-related factors" that resulted in a change to Goldman Sachs' analysis that was presented by Goldman Sachs to the Board on December 2, 2011.

(o)     Fails to disclose the "advantages and disadvantages of accepting a cash merger proposal" that was discussed by the Board on December 7, 2011.

(p)     Fails to disclose the reasons considered by the non-employee members of the Board on December 7, 2011 in concluding "that moving the process forward in an expeditious manner would be in the best interests of the stockholders of Blue Coat."

(q)     Fails to disclose the reasons the Board determined on December 7, 2011 that "that PE2 and PE3 were unlikely to be able to be competitive in the process."

(r)     Fails to disclose whether Francisco Partners was PE1, PE2, or PE3.

(s)     States that "Goldman Sachs has provided certain investment banking services to Blue Coat and its affiliates from time to time for which its Investment Banking Division has received, and may receive, compensation" and that "Goldman Sachs also has provided certain investment banking services to Thoma Bravo and its affiliates and portfolio companies from time to time for which its Investment Banking Division has received, and may receive, compensation" but fails to disclose the nature of the services performed and the amount of compensation received.

(t)     States that "affiliates of Goldman Sachs also may have co-invested with Thoma Bravo and its affiliates from time to time and may have invested in limited partnership units of affiliates of Thoma Bravo from time to time and may do so in the future" but fails to disclose the nature and terms of these investments.

(u)     Fails to disclose whether and if so, when, Thoma Bravo indicated their intent to employ any of the Company's executive officers upon consummation of the Proposed Transaction.

(v)     Fails to disclose the nature of any discussions and negotiations, if any, that occurred following the announcement of the Proposed Transaction related to any post-transaction employment arrangements for the Company's executive officers.

18

65267

1           (w)     Fails to disclose the reasons NeSmith resigned as a director on December 16,

2 2011, including whether the reasons for his resignation had any connection to the announcement of

3 the Proposed Transaction.

4         **Disclosures Concerning the Company's Financial Forecasts**

5        60.     The Proxy fails to disclose material information concerning the financial forecasts

6 of Blue Coat that were prepared by Blue Coat management and used by Goldman Sachs in its

7 various financial analyses. Specifically, the Proxy should disclose the following items for the last

8 two quarters of fiscal 2012 and fiscal years 2013 through 2017 that were used to calculate the

9 Company's free cash flows:

10            (i)     stock-based compensation;

11            (ii)     changes in working capital;

12            (iii)     capital expenditures; and

13            (iv)     and other miscellaneous non-cash items.

14        61.     The Proxy also fails to disclose the "three year financial plan that had been adopted

15 by the Board in the Spring of 2011" which is particularly important considering the 2012 to 2014

16 projections prepared by management in September 2011 "was less detailed and comprehensive

17 than the approach that had been taken with the original three year plan."

18        62.     The Proxy also fails to disclose the assumptions used by Blue Coat management to

19 prepare the Company's projections.

20        63.     The Proxy also fails to, but should, disclose the "update[s] to the preliminary

21 financial projections for the two remaining quarters of fiscal 2012" that were provided by

22 management to Goldman Sachs on November 29, 2011.

23        **Disclosures Related to Goldman Sachs' Financial Analyses and Opinion Regarding**

24        **the Value of the Company**

25        64.     The Proxy also fails to disclose certain data and inputs underlying the financial

26 analyses supporting the fairness opinion of the Board's financial advisor, Goldman Sachs,

27 including:

28

(a)     with respect to the *Selected Companies Analysis,* the criteria used to determine which companies were deemed similar to Blue Coat and thus selected for use in the analysis; the multiples observed for each company in the analysis; the reasons IBES estimates were used for Blue Coat's 2012 and 2013 sales, 2012 and 2013 EBITDA, and 2012 and 2013 earnings multiples as opposed to the projections prepared by Blue Coat management; and the conclusions drawn by Goldman Sachs from the analysis;

(b)     with respect to the *Illustrative Discounted Cash Flow Analysis,* the criteria used to select the terminal value free cash flow growth rates of 3.0% to 5.0%; the Company's weighted average cost of capital ("WACC") estimate calculated by Goldman Sachs that was used in selecting the discount rate range of 17.0% to 19.0%; the key inputs used to calculate the Company's WACC, which is particularly important considering the Proxy States that on December 7, 2011 the Board was concerned that "volatility in Blue Coat's stock price resulted in relatively higher WACC and discount rates than would have been applied in certain prior periods"; and the present value of Blue Coat's federal net operating loss carryforwards calculated in the analysis.

(c)     with respect to the *Present Value of Future Share Price Analysis,* the criteria used to select price to forward earnings per share multiples of 12.0x to 24.0x to earnings per share; and

(d)     with respect to the *Selected Transactions Analysis,* the criteria used to select the transactions used in the analysis, the premiums and multiples observed for each transaction in the analysis, and the conclusions drawn by Goldman Sachs from the analysis.

65.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

### CLAIMS FOR RELIEF

### COUNT I
### Violations of Section 14(a) of the Exchange Act
### and Rule 14a-9 Promulgated Thereunder

66.     Plaintiff repeats all previous allegations as if set forth in full herein.

67.     Defendants have issued the Proxy with the intention of soliciting shareholder support of the Proposed Transaction.

65267

68.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

69.     Specifically, the Proxy violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have know that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

70.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II
### Breach of Fiduciary Duties
### (Against All Individual Defendants)

71.     Plaintiff repeats all previous allegations as if set forth in full herein.

72.     The Individual Defendants have knowingly and recklessly and in bad faith violated fiduciary duties of care, loyalty, good faith, and independence owed to the public shareholders of Blue Coat and have acted to put their personal interests ahead of the interests of Blue Coat shareholders.

73.     The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize Blue Coat's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

74.     The Individual Defendants have breached their fiduciary duties of loyalty, good faith, and independence owed to the shareholders of Blue Coat because, among other reasons:

(a)     they failed to take steps to maximize the value of Blue Coat to its public shareholders and took steps to avoid competitive bidding;

65267

(b)      they failed to properly value Blue Coat; and

(c)      they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction.

75.      As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Blue Coat's assets and will be prevented from benefiting from a value-maximizing transaction.

76.      Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

77.      Plaintiff and the Class have no adequate remedy at law.

### COUNT III

**Breach of Fiduciary Duty -- Disclosure**
**(Against Individual Defendants)**

78.      Plaintiff repeats all previous allegations as if set forth in full herein.

79.      The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting Blue Coat's shareholders.

80.      As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

81.      As a result, Plaintiff and the Class members are being harmed irreparably.

82.      Plaintiff and the Class have no adequate remedy at law.

### COUNT IV

**Aiding and Abetting**
**(Against Blue Coat, Thoma Bravo, Project Barbour and Merger Sub)**

83.      Plaintiff repeats all previous allegations as if set forth in full herein.

84.      As alleged in more detail above, Defendants Blue Coat, Thoma Bravo, Project Barbour, and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties.

22

65267

1 85. As a result, Plaintiff and the Class members are being harmed.

2 86. Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A) declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B) declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange and Rule 14a-9 promulgated thereunder;

(C) enjoining, preliminarily and permanently, the Proposed Transaction;

(D) in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E) directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(F) awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

Dated:  December 27, 2011  BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER LLP


By _____/s/_____
   Michael S. Strimling

Alan R. Plutzik (State Bar No. 77785)
Michael S. Strimling (State Bar No. 96135)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA  94598
Telephone:  (925) 945-0200
Facsimile:  (925) 945-8792
Email:  aplutzik@bramsonplutzik.com
Email:  mstrimling@bramsonplutzik.com

LEVI KORSINSKY LLP
Joseph Levi
Eric  M. Andersen

23

30 Broad Street, 15th Floor
New York, New York 10004
Telephone:  (646) 453-8908
Facsimile: (212) 363-7171
Email:  jlevi@zlk.com
Email:  eandersen@zlk.com

Attorneys for Plaintiffs

65267